(No. 91-CC-0926-)

EILEEN OWENS, n/k/a EILEEN BAGNELL, Claimant, *v.*
ILLINOIS STATE UNIVERSITY and THE BOARD OF REGENTS
OF THE REGENCY UNIVERSITIES SYSTEM, Respondents.

*Opinion filed May 13, 1994.*

HAYES, SCHNEIDER, HAMMER, MILES & COX (JAMES
P. GINZKEY, of counsel), for Claimant.

JOSEPH J. GOLEASH, JR., for Respondents.

## OPINION

SOMMER, C.J.

A hearing in the above-referenced case was held in Bloomington, Illinois, on March 15, 1993. Both parties were represented by counsel. The Claimant and her husband testified. The Claimant also called as witnesses Pam Troxel; Illinois State University police officer, Ron Lewis; Dr. Seymour Goldberg; Manuel Cordero; and engineer, Moreley Brickman. The testimony of Crist Schwelle was presented by stipulation. The Respondent cross-examined all of the Claimant's witnesses, and also called Tim Kearney as a witness. The Claimant filed a brief, while the Respondent did not.

The Claimant fell at the One West door to the Respondent's Bone Student Center on January 5, 1990 at approximately 5:30 a.m. At that time, the Claimant was employed as the manager of the Dairy Queen at the Bone Student Center. When she fell, the Claimant's left buttock struck a tennis ball-sized metal door stop anchored to the sidewalk outside the One West door. The Claimant

testified that she slipped on water with frost or ice over it which had accumulated outside the One West door. "Well, there was a lot of moisture here [in front of the door], and it was slick. It was really slick. It was like a frost over it or something."

On cross-examination, the Claimant's testimony was as follows:

"Q. Was it more frost than ice on that occasion?

A. I would say it was like it hadn't rained, like it was a moisture that came down there and it froze. It was more like scum over there. It was like a frost.

Q. So there wasn't an identifiable pond of water with a hard coating on it?

A. Yes, there was.

Q. Where was it?

A. It was on this door. When you come up these sidewalks here, it was here and then went clear across here. [Indicating] There is always water there. There was water even there in the sunshine.

Q. Okay. On the morning that you fell, is it your belief that there was frost everywhere on the—

A. Yes.

Q. So there was a general frost condition?

A. Uh-huh.

Q. Not a specific patch of ice that you slipped on?

A. It was frost. Ice, or frost, or whatever you want to call it. It was slick."

Pam Oliver Troxel, a student, who took the Claimant to the hospital, stated she had slipped a number of times where the Claimant fell. Tim Kearney, the facilities manager, testified that no falls had been reported where the Claimant fell.

The Claimant told Manuel Cordero, the Respondent's maintenance man, that she had fallen. He went to the One West door and did see ice outside the door. The Bone Student Center does keep a supply of salt and sand for sidewalks, but there was no salt or sand on the ice outside the One West door.

This Court finds that there was water present which froze into a slick surface which we will call ice.

The Claimant claims that the water forming the ice at this entrance had two sources—the recessed wall corner just to the north of the door in question, and the patio/overhang above the door. The Claimant argues that the ice formed by these two conditions constituted an unnatural accumulation of ice.

The recessed wall corner where the Claimant fell extends all the way to the roof of the Bone Student Center. The Respondent's facilities manager, Tim Kearney, testified that the white cast to the bricks in the recessed wall corner is from water, but that he did not believe the recessed wall corner causes water to run all the way from the top of the Bone Student Center to the One West door. The Claimant's engineer, Morley Brickman, testified that it was his professional opinion that the recessed wall corner is discolored because of running water, and that the recessed wall corner acts as a channel. Then because of the pitch in front of the door the water cannot drain any. In addition, for approximately five years prior to this fall, there had been a water infiltration problem from the patio/overhang above the One West door. Manuel Cordero acknowledged that when it rained, water would come down from the patio above. Engineer Brickman opined that the discoloration of the brick underneath the patio/overhang is indicative of water having come down from the overhang. Tim Kearney stated that the patio/overhang had been caulked at one time.

The Claimant's argument is that the Respondent had a duty to prevent unnatural accumulations of ice created by artificial causes or in an unnatural way by the design defects of its property or lack of maintenance thereof. *McCan v. Bethesda Hospital* (1980), 80 Ill. App. 3d 544; *Lapidus v. Hahn* (1983), 115 Ill. App. 3d 795.

The condition had persisted for some time and both the building's maintenance man, Manuel Cordero, and the facilities manager, Tim Kearney, indicated an awareness of the condition. Therefore, the Respondent had knowledge of the abnormal accumulation of water and ice in front of the door.

The burden of rectifying the situation would not have been great. Sand or salt could have been spread, the patio/overhang could have been caulked, and a drain or downspout could have been used to carry away the water from the recessed wall corner.

Therefore, we find that the Respondent was negligent in knowingly allowing an unnatural accumulation of ice to exist where the burden of rectifying the situation would not have been great.

The Claimant's physician, Dr. Seymour Goldberg, testified that, in his opinion, falling on the doorstep as opposed to a flat surface localized the blow to the Claimant's buttock. The fall caused a severe hematoma which resulted in a permanent eight-inch by ½-inch indentation and scar in the plaintiff's buttock. The Claimant incurred medical expenses of $3,266.39. The Claimant was physically unable to continue her work at the Dairy Queen. She subsequently found other employment, but was off work from the first week of March, 1990, until the first week of October, 1990. Her 1989 earnings were $14,855.76.

The Claimant requests damages for her medical bills, lost wages, permanent disfigurement and disability, and pain and suffering.

The Claimant's medical expenses have been stated above. The Claimant did try to return to work at the Dairy Queen, but her pain was so great that she was hos-

pitalized in early March, 1990. The Claimant did not return to work at the Dairy Queen because she believed that she was physically unable to do the work. After her release from the hospital, and as late as June 1, 1990, the Claimant's doctor gave the Claimant a note saying that she was temporarily disabled as far as work was concerned. She could not work where she had to be on her feet all the time. Finally, on October 5 or 7, the Claimant got a job at Osco Drugs where she was allowed to sit down every 15 or 20 minutes. The Claimant, basing her calculations upon the previous year's wages, requests compensation for lost wages from the date of the accident until early October of the same year in the amount of $8,665.76.

We will make an award including the amount of the medical bills and lost wages as calculated by the Claimant.

Remaining to be determined is our award for disfigurement and disability, and pain and suffering.

The Claimant has sustained permanent, though hidden, disfigurement and during her recovery period had a definite disability, as she could not climb stairs or stand for a period of time. Therefore, for disfigurement and disability we award $5,000.

The Claimant did undergo pain and suffering at the time of the injury and during her period of recovery. The Claimant's physician testified that the pain should subside and eventually disappear. The Claimant and the Claimant's husband testified that the Claimant was unable to sleep at night because of her pain, but the extent to which this pain was due to her injury or other conditions she suffers from, such as arthritis, was not clear from the record. We therefore award the Claimant $7,500 for past and future pain and suffering.

We also note that the Claimant at the time of the hearing was married and is now known as Eileen Bagnell. We therefore award the Claimant Eileen Owens, n/k/a Eileen Bagnell, $24,432.25 in full and complete satisfaction of her present claim.